## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DEBORAH ANN MCCASKILL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 12-CV-95-PJC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the** | ) | |
| **Social Security Administration,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Deborah Ann McCaskill ("McCaskill"), pursuant to 42 U.S.C. § 405(g),

requests judicial review of the decision of the Commissioner of the Social Security

Administration ("Commissioner") denying her application for supplemental security income

benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. §

636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.

Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  McCaskill

appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner

erred because the ALJ incorrectly determined that McCaskill was not disabled.  For the reasons

discussed below, the Court **AFFIRMS** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting
Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as
Defendant in this action.  No further action need be taken to continue this suit by reason of the
last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**

McCaskill was 53 years old at the time of the hearing before the ALJ on April 8, 2011. (R. 55, 60).  She completed high school and two years of college.  (R. 60).

McCaskill testified that she had used cocaine on one occasion about six months before the hearing and on another occasion a month-and-a-half before the hearing.  (R. 61-63).  Before those two occasions, she said she had used cocaine two-and-a-half years earlier.  (R. 62).

She said that her application was based on her lower back pain that radiated down her leg. (R. 63).  She said that the pain was sometimes severe enough that she had to get off her feet.  (R. 64).  This would happen about three times on a good day.  *Id.*  On these occasions, she would lie down on the bed.  (R. 64-65).  She would use cold compresses or ointments to try to relieve the pain.  *Id.*  If that did not relieve her pain, she would use over-the-counter medications or if needed use pain medication prescribed by her physician.  *Id.*  Her physician had prescribed Flexeril and Toradol.  (R. 65).  She said that the prescription medications made her sleep.  *Id.*  On a bad day, she would be in bed almost all day, and she thought 20 days a month were bad.  *Id.* When she needed to rest, she would need to lie down for 45 minutes to one hour before she could get back up and do some activity.  (R. 66).  She was so tired that she had trouble completing chores such as laundry.  (R. 69-70).  She thought she rested at least five hours a day due to feeling tired.  (R. 70).

McCaskill described difficulty she had in walking to a bus stop that was five blocks from her house.  (R. 72).  She took a short cut to shorten the distance, but she still needed to stop to rest once before she got to the bus stop.  *Id.*  When she walked to the bus stop the day of the hearing, she was in pain, and she described that as a good day.  *Id.*  On a bad day, McCaskill said that she would start hurting after walking half a block.  *Id.*  On a good day, she could stand for

2

about 20 to 30 minutes before need to stop and rest.  *Id.*  On a bad day, it was painful to leave her bedroom at all, so she tried to minimize the time she had to stand, such as by using microwave dinners.  (R. 72-73).  Sitting caused unbearable pain after 30 minutes on a good day and after 10 or 15 minutes on a bad day.  (R. 73).  McCaskill thought she could lift about 10 pounds without aggravating her back pain.  *Id.*  She had trouble picking up a gallon of milk.  (R. 74-75).  She had trouble crawling, squatting, bending, and climbing stairs.  (R. 75).

She washed the dishes, and she tried to prepare meals.  (R. 75).  She took breaks to do chores.  (R. 75-76).  Her daughter did the laundry.  (R. 75).

McCaskill testified that she did not have a driver's license.  (R. 76).  She had previously had one before going to prison around 1991, and she understood that she would need to take classes before getting another driver's license.  *Id.*

Her typical day had been different at the time of the hearing, because she had grandchildren staying with her temporarily, so she would get them off to school.  (R. 77-78).  She then went back to bed and got up about nine o'clock.  (R. 78).  She checked her sugar level for her diabetes and then had breakfast.  *Id.*  Then she would sit and read her bible.  *Id.*  She would then make her bed and dust.  *Id.*  Then she would try to do her exercises, and after doing that she would lie down because she would be in pain.  *Id.*  She would try to get up at 2:30 p.m. so that she could feed the grandchildren a snack.  *Id.*  She would then lie down again.  *Id.*  She would force herself to get up and fix dinner.  *Id.*  She would then take a shower and go to bed around 9:00 p.m.  (R. 78-79).  She sometimes had trouble sleeping because she would think about traumatic events.  (R. 79).  She would sometimes take a Seroquel to stop "seeing these things" and to go to sleep, but the medication made her feel like a "zombie" the next day.  *Id.*

3

McCaskill testified that she had received physical therapy for several months, and she had been taught exercises to do at home.  (R. 65-66).  She tried to do those exercises at home.  (R. 66).

McCaskill testified that she had been having memory problems for about four years before the hearing.  (R. 66-67).  She said she also had problems with focus and attention.  (R. 67-68).  She said that she had auditory and visual hallucinations.  *Id.*  She said these episodes happened at least three times a month.  (R. 69).  She said she felt depressed.  (R. 71).  She described a suicide attempt when she was in her 20s.  *Id.*  She said that she still had suicidal thoughts, but not like when she was younger.  (R. 71-72).  McCaskill said that she was taking Prozac and Seroquel and had previously taken Zoloft.  (R. 68).

McCaskill presented to the emergency room at the Tulsa Regional Medical Center on June 26, 2006.  (R. 205).  Her chief complaint was back pain that had started one week earlier.  (R. 206).  The clinical impression was acute myofascial strain, and she was prescribed Lortab and Flexeril.  (R. 207).

On March 11, 2009, McCaskill saw Stanley Hanan, M.D. at Associated Centers for Therapy ("ACT") as a new patient.  (R. 231).  His assessment was mood disorder, not otherwise specified, with psychotic features.  *Id.*  She was prescribed Zoloft and Seroquel, and she was advised to abstain from use of drugs and alcohol.  *Id.*  On April 8, 2009, Dr. Hanan adjusted the type of Seroquel prescribed to address "excessive morning somnolence and hangover" experienced by McCaskill.  (R. 230).  On May 11, 2009, June 8, 2009, and July 6, 2009, Dr. Hanan adjusted McCaskill's medications.  (R. 227-29).

McCaskill presented to the emergency room at the Oklahoma State University Medical Center ("OSUMC") on January 17, 2010 with back pain. (R. 302-04). On examination, she had bilateral paralumbar tenderness with associated spasm. (R. 303). Straight leg raising was negative. *Id.* She returned on February 11, 2010 with chest pain. (R. 305-12).

McCaskill returned to the emergency room at OSUMC on September 12, 2010 with chest pain. (R. 313-19). A urine test was positive for cocaine. (R. 316). The discharge diagnoses were chest pain most likely secondary to cocaine abuse with negative cardiac enzymes; cocaine abuse; dysuria with negative urinalysis; chronic back pain; and depression. (R. 315). She returned on September 15, 2010 and was diagnosed with a urinary tract infection. (R. 320-21). She returned on September 26, 2010 with a headache. (R. 322-24). The physician's impression was that McCaskill's headache was related to her musculoskeletal complaints. (R. 323).

McCaskill was hospitalized at OSUMC from March 5, 2011 to March 8, 2011. (R. 328-32). She told hospital staff that she had smoked cocaine three days before presenting to the hospital for severe throat pain. (R. 332). Discharge diagnoses were severe reflux esophagitis to mid-esophagus with small hiatal hernia; diabetes mellitus, new diagnosis, uncontrolled; dyslipidemia; and polysubstance abuse. (R. 328). She was instructed to follow up with a physician at the Outpatient Internal Medicine office for close monitoring of her diabetes. *Id.* She was also instructed to follow up with a physician regarding her auditory hallucinations. *Id.* She was instructed not to use cocaine. *Id.*

Agency consultant Joel Justin Hopper, D.O. examined McCaskill on December 3, 2008 and prepared a report. (R. 221-26). Her chief complaint was lower back pain. (R. 221). Dr. Hopper said that McCaskill moved about the examination room easily, and she had full range of motion of her spine. (R. 222). Straight leg raising was negative, her toe and heel walking was

5

normal, and she ambulated with a stable gait at an appropriate speed without any assistive

devices.  *Id.*  Dr. Hopper's assessment was back pain without paresthesias, and he suggested that

radiological studies might be helpful in evaluating the source of her pain.  *Id.*

Agency consultant Seth Nodine, M.D. examined McCaskill on February 23, 2010 and

completed a report.  (R. 246-53).  Dr. Nodine reported that McCaskill had pain with range of

motion of the lumbar spine, along with tenderness to palpation, spasm, and lumbago of the

lumbar spine.  (R. 247).  Straight leg raising was positive for the left leg.  *Id.*  Dr. Nodine said

that McCaskill ambulated normally without assistive devices, and she favored her right leg

slightly.  *Id.*  Dr. Nodine's assessment was that McCaskill had previously had chronic

intermittent lower back pain without radiculopathy.  *Id.*  He said that McCaskill now had

radiculopathy into the left leg with intermittent weakness requiring use of a cane that had started

in the past six months.  *Id.*  He also assessed depression with psychosis, but noted that McCaskill

was going to a psychological evaluation.  *Id.*  The backsheet attached to Dr. Nodine's report

showed slightly reduced range of motion with pain.  (R. 252).  It reflected weak heel and toe

walking on the left side, positive straight leg raising on the left side, and tenderness and muscle

spasm.  *Id.*

Views of McCaskill's lumbar spine were completed on May 3, 2010 as part of the agency

evaluation process.  (R. 258).  They showed minimal degenerative change with slight disc space

narrowing and small degenerative spur formation at the L1/L2 level.  *Id.*  Slight dextroscoliosis

was also noted.  *Id.*

Nonexamining agency consultant J. Marks-Snelling, M.D., completed a Physical Residual Functional Capacity Assessment on June 26, 2010.  (R. 281-88).  For exertional limitations, Dr. Marks-Snelling found that McCaskill could perform light work.  (R. 282-83).  In spaces for narrative comments, Dr. Marks-Snelling briefly summarized Dr. Nodine's consultative examination and report.  (R. 282).  Dr. Marks-Snelling also noted the results of the May 3, 2010 x-rays.  (R. 282-83).  Finally, she reviewed McCaskill's reported activities of daily living.  (R. 283).  Dr. Marks-Snelling found that no postural, manipulative, visual, communicative, or environmental limitations were established.  (R. 283-88).

Agency consultant Jeri Fritz, Ph.D. evaluated McCaskill on March 29, 2010.  (R. 254-57).  McCaskill reported that she had been depressed for seven years, and she often felt suicidal when she was out of pain medications.  (R. 254).  Dr. Fritz observed that McCaskill appeared physically uncomfortable during the interview and was tearful at times.  (R. 256).  She ambulated slowly and said that she used a walker or a "walking stick."  *Id.*  McCaskill's long-term memory appeared without normal limits, but her short-term memory appeared impaired.  *Id.*  Dr. Fritz said that McCaskill demonstrated the ability to understand, retain, and follow directions.  (R. 257).  She estimated McCaskill's ability to relate to others to be fair.  *Id.*  Her ability to handle stress was judged to be poor.  *Id.*  Dr. Fritz's Axis I[2] diagnosis was major depression, recurrent, severe without psychotic features.  *Id.*  She also included diagnoses to rule out pain disorder with both a general medical condition and psychological factors; and to rule out alcohol abuse.  *Id.*

---

[2] The multiaxial system "facilitates comprehensive and systematic evaluation."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

She scored McCaskill's current Global Assessment of Functioning ("GAF")[3] as 55.

Agency nonexamining consultant Carolyn Goodrich, Ph.D. completed a Psychiatric

Review Technique Form and a Mental Residual Functional Capacity Assessment on May 12,

2010.  (R. 263-76).  For Listing 12.04, Dr. Goodrich noted McCaskill's mood disturbance with

depressive syndrome.  (R. 266).  For Listing 12.09, Dr. Goodrich noted the note Dr. Fritz had

made to rule out alcohol abuse.  (R. 271).  For the "Paragraph B Criteria,"[4] Dr. Goodrich found

that McCaskill had moderate restriction of activities of daily living, moderate difficulties in

maintaining social functioning, and moderate difficulties in maintaining concentration,

persistence, or pace, with no episodes of decompensation.  (R. 273).  In the "Consultant's Notes"

portion of the form, Dr. Goodrich briefly summarized Dr. Fritz's report.  (R. 275).  Dr. Goodrich

also reviewed the treatment notes of Dr. Hanan showing good response to prescribed

medications.  *Id.*  Finally, Dr. Goodrich summarized McCaskill's activities of daily living as she

reported them and as they were reported by third parties.  *Id.*

---

[3] The GAF score represents Axis V of a Multiaxial Assessment system.  *See* DSM IV at 32-36.  A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32.  The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id.* at 34.  A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.*  A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

[4] There are broad categories known as  the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment.  The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration.  Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 12.00C.  *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

In her Mental Residual Functional Capacity Assessment, Dr. Goodrich found that McCaskill was markedly limited in her ability to understand, remember, and carry out detailed instructions.  (R. 277).  Dr. Goodrich also found McCaskill to be markedly limited in her ability to interact appropriately with the general public.  (R. 278).  She found no other significant limitations.  (R. 277-78).  Dr. Goodrich found that McCaskill could perform simple tasks with routine supervision, cuold relate to supervisors and peers on a superficial work basis, and could adapt to a work situation.  (R. 279).  She said that McCaskill could not relate to the general public.  *Id.*

### Procedural History

McCaskill filed an application in November 2009 for Title XVI supplemental security income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  (R. 139-41).  The application was denied initially and on reconsideration.  (R. 90-93, 96-98).  A hearing before ALJ Lantz McClain was held on April 8, 2011.  (R. 55-83).  By decision dated April 29, 2011, the ALJ found that McCaskill was not disabled.  (R. 30-47).  On March 29, 2012, the Appeals Council denied review of the ALJ's findings.  (R. 1-8).  Thus, the decision of the ALJ represents a final decision for purposes of this appeal.  20 C.F.R. § 416.1481.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A).  A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[5] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.*

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id.*, (*quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the

---

[5] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

## Decision of the Administrative Law Judge

At Step One, the ALJ found that McCaskill had not engaged in substantial gainful activity since her application date of November 13, 2009.  (R. 32).  At Step Two, the ALJ found that McCaskill had severe impairments of degenerative disc disease of the spine, diabetes mellitus, and depression.  *Id.*  At Step Three, the ALJ found that McCaskill's impairments did not meet any Listing.  (R. 32-34).

The ALJ determined that McCaskill had the RFC to perform light work except that she was "restricted to simple, repetitive tasks, no more than incidental contact with the public and is unable to work as part of a team."  (R. 34).  At Step Four, the ALJ found that McCaskill had no past relevant work.  (R. 40).  At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that McCaskill could perform, considering her age, education, work experience, and RFC.  (R. 41-42).  Thus, the ALJ found that McCaskill was not disabled since November 13, 2009.  (R. 42).

## Review

McCaskill raises issues relating to Step Five, to the ALJ's analysis of opinion evidence, and to the ALJ's credibility assessment.  Plaintiff's Opening Brief, Dkt. #18, p. 2.  Regarding the issues raised by McCaskill, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements.  Therefore, the ALJ's decision is affirmed.

## Step Five Issues

McCaskill's first argument is that the ALJ failed to include all of her impairments when determining her RFC.  She argues that the evidence showed that she needed assistive devices to

walk and that therefore she could not perform light work.  While there is limited evidence supporting McCaskill's use of assistive devices for walking, that evidence is hardly unequivocal. She was given crutches at the emergency room of Tulsa Regional Medical Center on June 26, 2006, well before the relevant time period.  (R. 210).  The strongest evidence is the report of Dr. Nodine, finding that McCaskill had weak heel and toe walking on the left side, positive straight leg raising on the left side, and pain with range of movement of the lumbar spine.  (R. 248, 252). In spite of these findings, Dr. Nodine also observed that McCaskill had a normal and steady gait without use of assistive devices favoring her right leg slightly.  (R. 248).  The remainder of the evidence regarding McCaskill's limitations in walking and need for assistive devices is purely subjective evidence from her.  Dr. Nodine's diagnosis of radiculopathy into the left leg with intermittent weakness requiring intermittent use of a cane was obviously based on McCaskill's statements to him, because she did not show need for a cane during his examination.  *Id.*  Under a "neurological" heading stating the results of his examination, Dr. Nodine stated that McCaskill's strength and sensation were intact.  *Id.*

Based on Dr. Nodine's report and the other evidence available to her, Dr. Marks-Snelling found that McCaskill was capable of performing light work, including the ability to stand and/or walk for about 6 hours in an 8-hour workday.  (R. 282-83).  Thus, the ALJ had a mix of evidence available to him regarding McCaskill's ability to walk.  The ALJ's credibility assessment, as discussed below, was supported, and therefore the ALJ was entitled to discount the purely subjective complaints of McCaskill.  There was substantial evidence supporting his RFC determination that McCaskill was capable of performing work at the light exertional level.

In this section of Plaintiff's Opening Brief, counsel for McCaskill argue that her moderate difficulty in maintaining concentration, persistence, or pace, one of the Paragraph B Criteria,

correlates to certain findings in the Mental Residual Functional Capacity Assessment.  Plaintiff's Opening Brief, Dkt. #17, pp. 3-4.  They assert that McCaskill's moderate difficulty in maintaining concentration, persistence, or pace correlates to two functional limitations:  (1)  a finding that she has a limitation in her ability to maintain attention and concentration for extended periods; and (2) a finding that she has a limitation in her ability to complete a normal workday or workweek without interruptions from psychologically based symptoms.  *Id.*

The argument that Paragraph B Criteria necessarily implicate any particular functional limitation listed in the Mental Residual Functional Capacity Assessment is specious.  The Tenth Circuit rejected this argument by McCaskill's counsel in an unpublished case decided in 2006.  *See Heinritz v. Barnhart*, 191 Fed. Appx. 718, 721-22 (10th Cir. 2006) (unpublished).  In *Heinritz*, counsel had asked the VE if someone with a marked limitation in the domain of concentration persistence, or pace could work, and the VE had testified that the limitation precluded competitive work.  *Id.* at 721.  The Tenth Circuit said that while the agency consultants had found a marked limitation of concentration, persistence, or pace for the Paragraph B Criteria on the Psychiatric Review Technique form, those consultants found that only three of twenty specific mental activities were impaired on the Mental Residual Functional Capacity Assessment form.  The court found that the ALJ's RFC was consistent with these specific findings of the consultants, and therefore there was no reversible error.  *Id.* at 721-22.

Counsel for McCaskill attempt to merge the Paragraph B Criteria reflected on the Psychiatric Review Technique form and used at Step Three with the functional criteria reflected on the Mental Residual Functional Capacity Assessment form that is used at Steps Four and Five.  This attempt disregards the different purposes of these forms.  In 1996, the Social Security Administration explained these different purposes:

> The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.  The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the [Psychiatric Review Technique form].

Social Security Ruling 96-8P, 1996 WL 274184 *4.  The undersigned rejects the attempts of counsel to blur the lines between these two forms and their different purposes.  Here, the ALJ addressed McCaskill's mental functions by stating that she was "restricted to simple, repetitive tasks, no more than incidental contact with the public and is unable to work as part of a team." (R. 34).  This finding by the ALJ is consistent with the findings of Dr. Goodrich on her Mental Residual Functional Capacity Assessment.  (R. 277-79).

The ALJ's Step Five finding complied with legal requirements and was supported by substantial evidence.

**Opinion Evidence**

McCaskill argues that the ALJ did not explain the weight he gave to the opinions of the nonexamining consultants.  The ALJ's decision was consistent with the reports of all of the nonexamining consultants, and therefore he was not required to give as much explanation as would otherwise be required.  When evidence does not conflict with the ALJ's RFC determination, the ALJ has a reduced burden to expressly discuss the evidence.  *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004).

In *Howard*, the Tenth Circuit rejected the claimant's argument that the ALJ had not complied with his obligation to discuss the evidence, citing to *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  The *Howard* court first found that the ALJ's discussion was adequate,

but then, as a second point, found that "perhaps more importantly, in this case none of the record medical evidence conflicts with the ALJ's conclusion that claimant can perform light work. When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened." *Howard*, 379 F.3d at 947. *Howard* is directly applicable to the present case, because the ALJ did not need to reject or weigh the evidence of the nonexamining consultants in order to determine McCaskill's RFC. Instead, his RFC determination is consistent with those reports.

McCaskill next asserts that the ALJ erred in his consideration of the statement of Luther E. Eddins. Mr. Eddins completed a form titled "Function Report - Adult - Third Party." (R. 175-82). The ALJ stated that he had considered the "statements" of Mr. Eddins and "considered this evidence as an opinion from a non-medical source." (R. 40). He gave several reasons for giving Mr. Eddins's statements "little weight." *Id.* McCaskill complains about many of the reasons, stating that they are speculative or that the ALJ did not explain them sufficiently, but the undersigned finds that the ALJ's discussion of Mr. Eddins's statements was adequate. *See Zumwalt v. Astrue*, 220 Fed. Appx. 770, 780 (10th Cir. 2007) (unpublished) (LPC was not an acceptable medical source, and ALJ's treatment of her evidence was sufficient); *Lundgren v. Colvin*, 2013 WL 936358 *3 (10th Cir.) ( unpublished) (explanation was sufficient because it permitted reviewing court to follow the adjudicator's reasoning), *quoting Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1164 (10th Cir. 2012) (further quotations omitted).

McCaskill asserts that the ALJ was required to discuss the observations of the Social Security Administration clerk that she had difficulty sitting and concentrating. Plaintiff's Opening Brief, Dkt. #17, p. 6. The undersigned rejects this assertion, for which McCaskill cites to two District of Kansas decisions. The ALJ's omission of this minor fact does not require

remand.  *See Holcomb v. Astrue*, 389 Fed. Appx. 757, 760 (10th Cir. 2010) (unpublished) (ALJ

was not required to discuss lower GAF scores that were "bits of information not essential to [the

claimant's] RFC determination, inadequate to establish disability, and contradicted by an opinion

from an acceptable medical source"); *Korum v. Astrue*, 352 Fed. Appx. 250, 253-54 (10th Cir.

2009) (unpublished) (ALJ's opinion was thorough, and evidence not mentioned by the ALJ was

not of such quality as to require discussion).  The same is true of McCaskill's argument that the

ALJ was required to take notice that she needed to stand during the hearing.

The ALJ's consideration of the opinion evidence complied with legal requirements.

**Credibility Assessment**

Credibility determinations by the trier of fact are given great deference.  *Hamilton v.*

*Secretary of Health & Human Services,* 961 F.2d 1495, 1499 (10th Cir. 1992).

> The ALJ enjoys an institutional advantage in making [credibility determinations].
> Not only does an ALJ see far more social security cases than do appellate judges,
> [the ALJ] is uniquely able to observe the demeanor and gauge the physical
> abilities of the claimant in a direct and unmediated fashion.

*White v. Barnhart,* 287 F.3d 903, 910 (10th Cir. 2002).  In evaluating credibility, an ALJ must

give specific reasons that are closely linked to substantial evidence.  *See Kepler v. Chater*, 68

F.3d 387, 391 (10th Cir. 1995); Social Security Ruling 96-7p, 1996 WL 374186.  "[C]ommon

sense, not technical perfection, is [the] guide" of a reviewing court.  *Keyes-Zachary*, 695 F.3d at

1167.

After an introductory sentence,[6] the ALJ discussed McCaskill's treating records, Dr.

Nodine's consultative examination report, Dr. Fritz's mental status examination report, and the

nonexamining consultants' reports.  (R. 36-38).  The ALJ then went on to give at least eight

detailed, specific reasons why he found McCaskill less than fully credible, and he tied those

reasons to substantial evidence.  (R. 38-40).  The undersigned will not recite all eight reasons, but

instead will mention a few that are most compelling.  For example, the ALJ found that

McCaskill's use of prescription medications was erratic, and there were significant periods

during which she apparently went without medication.  (R. 39).  The extent of the claimant's

efforts to obtain relief is a legitimate specific reason for a finding of credibility.  *Kepler*, 68 F.3d

at 391; *Hagar v. Barnhart*, 102 Fed. Appx. 146, 148 (10th Cir. 2004) (unpublished) (ALJ was

entitled to consider that, if the claimant's symptoms were as debilitating as asserted, she would

have sought additional treatment).

The ALJ also noted McCaskill's limited treatment for her allegedly disabling mental

impairments.  (R. 39).  She was inconsistent in her use of these medications, as well, and she had

only attended counseling on a limited basis.  *Id.*  Again, McCaskill's limited attempts to receive

medical treatment for her mental health conditions, and her inconsistent use of prescription

---

[6] McCaskill faults the introductory language used by the ALJ: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (R. 36).  While this language might have been "meaningless boilerplate," it was merely an introduction to the ALJ's analysis and was not harmful.  *See Keyes-Zachary*, 695 F.3d at 1170 (use of boilerplate language in a credibility assessment is problematic only "in the absence of a more thorough analysis") (further quotations omitted).  McCaskill's counsel "well knows" that this argument is unavailing.  *Boehm v. Astrue*, 2013 WL 541067 n.3 (10th Cir.) (unpublished).

medications for the treatment of these conditions, are legitimate reasons for finding her less than fully credible. *See, generally, Mayberry v. Astrue*, 461 Fed. Appx. 705, 710-11 (10th Cir. 2012) (unpublished) ("sparse" medical evidence supported the ALJ's adverse credibility determination).

Another reason the ALJ gave for his credibility assessment was related to McCaskill's use of cocaine and alcohol.  (R. 40).  He recounted some of McCaskill's inconsistent statements regarding her use of cocaine and alcohol, and he said that the inconsistencies suggested that the information provided by McCaskill might not be entirely reliable. *Id.*  Pointing out inconsistencies in the claimant's statements is obviously a specific reason that supports a finding of reduced credibility. *Harris v. Astrue*, 2012 WL 3893128 at *4 (10th Cir.) (unpublished), *citing* SSR 96-7p, 1996 WL 374186 at *5.

The ALJ also commented on McCaskill's sporadic work history, stating that this raises the question of whether her continuing unemployment was due to medical impairments.  (R. 40). This also is a permitted reason supporting the ALJ's credibility assessment. *See Arles v. Astrue*, 438 Fed. Appx. 735, 738-39 (10th Cir. 2011) (unpublished) (ALJ's comments on lack of motivation to work were based on permissible inferences and not speculation).

Faced with the ALJ's detailed credibility assessment which gave several specific legitimate reasons for finding McCaskill less than fully credible, all of which were supported by substantial evidence, McCaskill first objects to boilerplate provisions.  Plaintiff's Opening Brief, Dkt. #17, pp. 6-7.  Boilerplate is "problematic only when it appears 'in the absence of a more thorough analysis.'" *Keyes–Zachary,* 695 F.3d at 1170 (quoting *Hardman v. Barnhart,* 362 F.3d 676, 679 (10th Cir. 2004)).  McCaskill's case is an excellent example of an ALJ continuing past boilerplate provisions and giving a thorough analysis.  Therefore, in spite of the ALJ's use of

some boilerplate provisions, the Court is "persuaded that the ALJ's credibility determination is closely and affirmatively linked to substantial evidence." *Miller v. Astrue*, 496 Fed. Appx. 853, 857 (10th Cir. 2012) (unpublished).

The Tenth Circuit recently rejected McCaskill's argument that the ALJ's decision was invalid because he determined her RFC determination and then his introductory language to his credibility assessment said that he found her not credible to the extent that her claims were not consistent with that RFC. *Jimison ex rel. Sims v. Colvin*, 2013 WL 1150290 at *6 (10th Cir.) (unpublished). The Tenth Circuit said that the order of consideration in the ALJ's decision did not warrant reversal: "[A]lthough the ALJ's opinion recited his RFC finding before discussing credibility, there is no indication that the ALJ did not factor in [the claimant's] credibility." *Id.*

McCaskill objects to the ALJ's use of boilerplate language relating to "objective verification" of McCaskill's activities of daily living. She says that this language, which states that "allegedly limited daily activities cannot be objectively verified" imposes "an incorrect standard of proof." The Tenth Circuit has rejected this argument. *Wall v. Astrue*, 561 F.3d 1048, 1069-70 (10th Cir. 2009) (language was "common sense observation" by ALJ rather than imposition of objective verifiability as standard).

McCaskill makes other objections related to activities of daily living. Plaintiff's Opening Brief, Dkt. #17, pp. 9-10. For the most part, these are one-sentence arguments that are undeveloped and perfunctory and that deprive the Court of the ability to meaningfully analyze them. They are therefore waived. *Wall*, 561 F.3d at 1066. The Tenth Circuit stated this clearly in a recent unpublished case involving McCaskill's counsel:

> Although [claimant] lists four issues on appeal, she interjects numerous
> conclusory sub-issues and passing objections, many of which are poorly
> developed.  We will consider and discuss only those of her contentions that have
> been adequately briefed for our review.

*Miller*, 496 Fed. Appx. at 855.  *See also Keyes-Zachary*, 695 F.3d at 1161 (declining to consider

poorly developed sub-issues).

Even without a finding of waiver, McCaskill's arguments asserting that the ALJ erred in

his consideration of her activities of daily living are not persuasive.  *See, generally, Keyes-*

*Zachary*, 695 F.3d at 1172; *Zaricor-Ritchie v. Astrue*, 452 Fed. Appx. 817, 822-23 (10th Cir.

2011); *Kruse v. Astrue*, 436 Fed. Appx. 879, 885-86 (10th Cir. 2011) (unpublished).  In any

event, the ALJ's credibility reasons that were tied to McCaskill's activities of daily living were

only one small part of his overall credibility assessment.  The Court finds that the ALJ did not err

in his consideration of McCaskill's activities of daily living.

One puzzling aspect of McCaskill's credibility discussion is one paragraph stating that

the ALJ ignored that a somatoform disorder can be disabling.  Plaintiff's Opening Brief, Dkt.

#17, p. 9.  The undersigned is unaware of any evidence in the record that McCaskill suffered

from a somatoform disorder, and indeed, McCaskill makes no citations to the record.  The

undersigned can only conclude that this language is a "boilerplate" provision that counsel for

McCaskill erroneously inserted into the brief here.

McCaskill continues with a series of one-sentence assertions relating to treating physician

evidence, such as "[t]he fact that doctors have not stated that Claimant is disabled does not mean

that she is not."  As was true of the earlier one-sentence arguments of McCaskill, these argument

are perfunctory and, therefore, waived.  *Miller*, 496 Fed. Appx. at 855 (numerous passing

objections raised by claimant would not be reviewed because they were not adequately

developed).  Regardless of the question of waiver, however, none of these arguments undermines the supported credibility assessment of the ALJ.

McCaskill complains that the ALJ "miscast" the evidence by saying that her trips to the emergency room were "infrequent."  The undersigned rejects this assertion by McCaskill, but even if the ALJ's statement that McCaskill went to the emergency room infrequently was erroneous, the error would not be of sufficient importance to affect the validity of his credibility assessment.  *Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir. 1993) ("minor error" did not "undermine confidence" in the ALJ's decision); *Boehm*, 2013 WL 541067 at *2 n.2.

McCaskill argues that the ALJ did not specify which parts of her testimony he accepted as true.  The Tenth Circuit recently rejected this argument in *Jimison,* and the court found that it was clear enough which portions the ALJ considered to be true or untrue based on the decision as a whole.  *Jimison ex rel. Sims*, 2013 WL 1150290 at *6.  The same is true here.

"In sum, the ALJ closely and affirmatively linked his adverse credibility finding to substantial evidence in the record and did not employ an incorrect legal standard.  'Our precedents do not require more, and our limited scope of review precludes us from reweighing the evidence or substituting our judgment for that of the agency.'"  *Zaricor-Ritchie*, 452 Fed. Appx. at 824, *citing Wall*, 561 F.3d at 1070 (further quotations omitted).

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct

legal standards were applied.  The decision is **AFFIRMED**.

Dated this 10th day of May 2013.

Paul J. Cleary
United States Magistrate Judge